Patrick Carey, (Bar No. 308623)
LEXINGTON LAW GROUP, LLP
503 Divisadero Street
San Francisco, California 94117
Telephone: (415) 913-7800
pcarey@lexlawgroup.com

David S. Golub, (*pro hac vice* forthcoming)
Ian W. Sloss (*pro hac vice* forthcoming)
Jennifer Sclar (*pro hac vice* forthcoming)
Jennifer A. Williams *(pro hac vice forthcoming*)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
Telephone: (203) 325-4491
isloss@sgtlaw.com
jsclar@sgtlaw.com
jwilliams@sgtlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEN SHELDON and SHANAYA GRANT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ZOOM COMMUNICATIONS, INC., f/k/a Zoom Video Communications, Inc., a Delaware corporation,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Ken Sheldon and Shanaya Grant ("Plaintiffs") on behalf of themselves and those similarly situated, based on information and belief and investigation of counsel, except for information based on personal knowledge, hereby allege as follows:

**NATURE OF THE ACTION**

1. Plaintiffs bring this class action against Defendant Zoom Communications, Inc. ("Zoom") to redress Zoom's unlawful policy and practice of systematically collecting, capturing, receiving or otherwise obtaining, analyzing, storing, retaining, using, and disseminating the biometric "voiceprints" and biometric information derived from such voiceprints of persons utilizing Zoom's technology services in Illinois without their notice or consent in violation of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq*. Plaintiffs seek relief on their own behalf and on behalf of a Class of similarly-situated persons in Illinois subjected to Zoom's still ongoing failure to comply with BIPA's requirements from September 2023 to the present.

2. At all relevant times, Zoom designed, operated, and controlled a proprietary software infrastructure and Artificial Intelligence (AI) technology used to automatically extract and process biometric voiceprints from participants in Zoom meetings in Illinois. Under Illinois law, because Zoom's own backend infrastructure and platform actively extract this biometric data, Zoom has a statutory duty to comply with BIPA's notice and consent requirements.

3. BIPA expressly provides that voiceprints constitute biometric identifiers subject to statutory protection. 740 ILCS 14/10. BIPA prohibits private entities from collecting, capturing, receiving, or otherwise obtaining a person's biometric identifier, unless they first provide written notice of the specific purpose and duration of collection, obtain an executed written release, and publish a publicly available data retention and destruction schedule. 740 ILCS 14/15(a), (b) & (d).

4. On September 5, 2023, Zoom formally launched "Zoom AI Companion," a suite of speech- and text-based AI tools native to its video conferencing platform. To provide its core features, including speaker-separated transcription, real-time meeting summaries, and topic-segmented recordings, Zoom

utilizes “speaker diarization” to separate speakers by actively analyzing and isolating the unique vocal characteristics of meeting participants.

5. Zoom’s “AI-first” business model relies on the collection, analysis, and use of biometric voiceprints. Its “Zoom AI” features are structurally incapable of functioning unless Zoom’s software isolates, processes, and systematically maps the underlying unique biometrically identifiable vocal characteristics that define each speaker’s identity to create a voiceprint.

6. Zoom has acted with conscious disregard for the mandatory consumer protections required by BIPA in favor of delivering what it markets as “frictionless and secure” meetings.[1] In its 2024 Form 10-K filed with the Securities and Exchange Commission, Zoom disclosed to investors that strict consumer privacy laws may be incompatible with its use of artificial intelligence and machine learning, and that legal compliance may make it harder for Zoom to conduct its business.[2] As Zoom acknowledged, its “inability or failure to obtain consent for [its data collection] practices could result in adverse consequences, including class action litigation and mass arbitration demands.”[3]

7. Zoom knowingly chose to side-step the transactional “friction” of obtaining written releases from millions of Illinois users authorizing the collection of their voiceprints before they join a Zoom meeting. Complying with Illinois law would potentially stall the automated, real-time data pipelines that feed Zoom’s core AI products.

8. Through this reckless, willful, and intentional conduct, Zoom has violated and continues to violate BIPA, depriving consumers of the power to withhold consent to the collection and capture of their biometric identifiers and biometric information.

---

[1] *See* Zoom 2025 Annual Report (Form 10-K) at 8 (Feb. 28, 2025).

[2] Zoom 2024 Annual Report (Form 10-K) at 33 (Mar. 1, 2024).

[3] *Id.* at 32.

9. Zoom's conduct reaches persons who have no account, no contract, and no prior or ongoing relationship with Zoom of any kind. As set forth below, Plaintiffs' controlled demonstration establishes that Zoom extracts voiceprints from participants who join meetings as unauthenticated guests — signed out of Zoom, without any Zoom account, following Zoom's own published instructions — and from persons whose voices are merely audible in the environment of a session they never joined.

10. Plaintiffs and the putative Class seek: (1) statutory damages under 740 ILCS 14/20(a)(1) and/or (2); (2) a permanent injunction requiring Zoom to comply with BIPA's disclosure, informed consent, and data retention requirements, pursuant to 740 ILCS 14/20(a)(4); (3) reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20(a)(3); and (4) all other appropriate equitable and just relief.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq.

12. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 putative Class members; and minimal diversity exists because Plaintiffs are citizens of Illinois, and Defendant Zoom is a Delaware corporation with its principal place of business in San Jose, California.

13. This Court has general personal jurisdiction over Zoom because Zoom maintains its principal place of business and corporate headquarters at 55 Almaden Boulevard, San Jose, California, within this District, rendering Zoom at home in this forum. Fed. R. Civ. P. 4(k)(1)(A); Cal. Code Civ. Proc. § 410.10.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Zoom resides in this District.

**INTRADISTRICT ASSIGNMENT**

15. Assignment to the San Jose Division is proper under Northern District of California Civil Local Rule 3-2(c) because a substantial part of the events or omissions which give rise to the claims asserted herein occurred in Santa Clara County and Defendant Zoom's principal place of business is located in Santa Clara County, California. Under Civil Local Rule 3-2(e), all civil actions which arise in the County of Santa Clara shall be assigned to the San Jose Division.

**PARTIES**

16. Plaintiff Ken Sheldon is a citizen of the State of Illinois, residing in Chicago, IL. Plaintiff Sheldon attended and spoke at a Zoom meeting in the State of Illinois subsequent to September 5, 2023 at which Zoom AI Companion and/or ZoomMate was in use and captured Plaintiff Sheldon's voice, including Zoom meetings on the following dates:

· May 13, 2026

· May 20, 2026

· May 21, 2026

· May 26, 2026

· June 2, 2026

· June 2, 2026

· June 2, 2026

· June 3, 2026

· June 4, 2026

· June 9, 2026

· June 10, 2026

· June 17, 2026

· June 18, 2026

· June 29, 2026

· July 8, 2026

· July 8, 2026

· July 15, 2026

· July 23, 2026

· August 5, 2026

· August 25, 2026

· September 10, 2026.

17. Plaintiff Shanaya Grant is a citizen of the State of Illinois, residing in Chicago, IL. Plaintiff Grant attended and spoke at a Zoom meeting in the State of Illinois subsequent to September 5, 2023 at which Zoom AI Companion and/or ZoomMate was in use and captured Plaintiff Grant's voice, including a Zoom meeting on August 14, 2026.

18. Defendant Zoom Communications, Inc. was incorporated under the laws of the State of Delaware in April 2011 under the name Saasbee, Inc. In February 2012, the company changed its name to Zoom Video Communications, Inc. In or about late 2024, it changed its name to Zoom Communications, Inc., and the change of name was recorded with the United States Patent and Trademark Office on January 7, 2025. Zoom's principal executive offices are located at 55 Almaden Boulevard, 6th Floor, San Jose, California 95113. At all times mentioned herein, Defendant Zoom has engaged in trade and commerce in the State of Illinois, including in conjunction with the marketing and operation of the Zoom services and technologies at issue in this action.

## SUBSTANTIVE ALLEGATIONS

### I. ABSENT COMPLIANCE WITH THE STATUTE'S NOTICE AND CONSENT AND RETENTION POLICY PROVISIONS, BIPA PROHIBITS THE COLLECTION, POSSESSION, RETENTION OR DISSEMINATION OF VOICEPRINTS.

#### A. The Statute Unequivocally Prohibits the Unauthorized Collection, Storage, and Disclosure of Biometric Identifiers and Biometric Information.

19. Section 15(a) of BIPA provides in relevant part that a private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public,

establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a).

20. Section 15(b) of BIPA further mandates that no private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first informs the subject in writing that a biometric identifier or biometric information is being collected or stored; informs the subject in writing of the specific purpose and length of the term for which it is being collected, stored, and used; and receives a written release executed by the subject. 740 ILCS 14/15(b).

21. Section 15(d) of BIPA tightly restricts disclosure or dissemination of a person's biometric identifier or biometric information without express user consent. 740 ILCS 14/15(d).

**B. The Illinois Legislature Imposed Strict Liability in Enacting BIPA by Design.**

22. The Illinois General Assembly enacted BIPA to regulate and safeguard how private entities handle Illinois consumers' unique biometric data. The legislature recognized that the use of biometrics was growing rapidly across commercial sectors and required strict procedural guardrails. 740 ILCS 14/1 *et seq*.

23. The legislature explicitly found that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). While a compromised password, credit card, or Social Security number can be changed or reissued, a compromised voiceprint cannot. If a private corporation mishandles a user's biometric identifier or biometric information that user is left with no recourse and is exposed to a permanent, lifelong risk of identity theft, commercial exploitation, unauthorized deepfake voice replication, and security breaches.

24. Accordingly, the Illinois General Assembly concluded that "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g).

25. To protect these fundamental privacy rights, Section 15(b) of BIPA implements a strict, mandatory notice-and-consent framework. A private entity is legally prohibited from collecting, capturing, purchasing, receiving, or otherwise obtaining a person's biometric identifier unless it first:

> a) Inform[s] the subject [...] in writing that a biometric identifier or biometric information is being collected or stored;
>
> b) Inform[s] the subject [...] in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and
>
> c) Receives a written release executed by the subject of the biometric identifier or biometric information[.] 740 ILCS 14/15(b)(1)-(3).

26. In addition, Section 15(a) of BIPA requires any private entity in possession of biometric data to develop, maintain, and comply with a publicly available written retention schedule and guidelines for permanently destroying the biometric data when the initial purpose for collection has been satisfied, or within three years of the individual's last interaction with the entity whichever occurs first. 740 ILCS 14/15(a).

27. To state a claim for violation of BIPA's requirements, a Plaintiff need not allege any injury beyond the statutory violation itself. *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186.

28. Biometrics is the numeric measurement and analysis of unique physical or behavioral characteristics. Biometric data is frequently used to identify individuals, for example through the use of fingerprint scans, facial recognition, or voiceprints. A numeric representation derived from a person's unique physical or behavioral characteristic that is capable of being used for identification purposes (e.g., data corresponding to a fingerprint, voiceprint, retina, or facial features) is commonly referred to as a "biometric identifier."

29. The human voice is a unique, identifying characteristic of an individual.[4] Depending on how the range of measurable characteristics of the human voice causally related to the vocal production process is quantized, the chances of two people having the same voice in a world populated by 10 billion people range from one in a few thousand to one in a septillion or less.

30. Despite consumers' ever-growing concerns with privacy, the use of biometric data by private companies is accelerating, with much of this growth attributable to the increased capability of smartphones and ubiquitous internet-connected devices to capture and collect an individual's biometric data.

31. Since an individual's physical characteristics cannot be easily changed (if at all), the use of biometric identifiers has serious implications for an individual's privacy. An entity that obtains possession of an individual's biometric identifier is able to track that individual wherever a device capable of capturing biometric identifiers is present. Additionally, because many financial institutions and healthcare providers use biometric identifiers--including voice--for authentication, possession of a person's biometric identifier can provide access to an individual's bank accounts or medical records.

**C. Voiceprints Form a Core Category of Biologically Unique Identifiers Explicitly Protected under BIPA**

32. Under BIPA, "biometric identifiers" are explicitly defined to include a "voiceprint." 740 ILCS 14/10.

33. A "voiceprint," as defined through widespread usage in the peer-reviewed academic literature, patent literature, and the speech technology industry, refers to any set of numeric features derived from one or more voice recordings that captures an individual's unique voice characteristics and is capable of being used to distinguish that individual from others, i.e., to identify the speaker. The defining

---

[4] Singh, R., & Raj, B. (2025). Human voice is unique. arXiv preprint arXiv:2506.18182. https://arxiv.org /pdf/2506.18182

attribute is the capacity to single out and recognize a particular human being; it is not necessary that the entity computing the voiceprint has separately learned that person's legal name.

34. US Patent No. 12,217,761 B2, titled "Target Speaker Mode," issued on February 4, 2025 and assigned to Zoom Video Communications, Inc., defines a voiceprint as:

> A digital representation of voice characteristics of a speaker. A voiceprint may be used to identify whether the speaker in an audio recording is the target speaker or not, based on comparison of the voice characteristics of the audio recording to a voiceprint of the target speaker. A voice print may comprise an embedding.
>
> The voice characteristics may comprise features of a person's voice that distinguish the voice from the voices of other people and may be dependent on physical features such as the shape and size of a speaker's vocal tract.

35. To compute a voiceprint, acoustic feature vectors are extracted ("computed") from raw audio, and a speaker-discriminative representation is then derived from them. Representations well recognized as voiceprints include i-vectors, x-vectors, d-vectors, speaker space transform embeddings, speaker codes, Gaussian mixture speaker models, and other similar speaker embeddings. These are derived from lower-level acoustic features such as mel-frequency cepstral coefficients ("MFCCs") and mel-filterbank feature matrices, which serve as the acoustic front end from which the speaker-discriminative representation is computed.

## II. ZOOM UNLAWFULLY CAPTURES, ANALYZES, AND STORES USER VOICEPRINTS THROUGH ITS SPEAKER DIARIZATION TECHNOLOGY IN VIOLATION OF BIPA.

### A. Overview of Zoom's Speech Technology

36. Zoom was founded in 2011, initially offering cloud-based video conferencing software, including its flagship products Zoom Meetings, Zoom Phone, and Zoom Team Chat.

37. During the COVID-19 pandemic, Zoom experienced exponential growth as millions of individuals utilized the platform for remote work, education, and personal communication, with daily meeting participants increasing from approximately 10 million in December 2019 to over 200 million by March 2020.

38. Zoom's expansive user base includes customers in the United States, including the State of Illinois, and across the globe, in numerous industry categories, including education, entertainment/media, enterprise infrastructure, finance, government, health care, manufacturing, nonprofit/not-for-profit and social impact, retail/consumer products, and software/internet.

39. In September 2023, Zoom aggressively transitioned its corporate focus towards artificial intelligence. In its 2024 Form 10-K SEC filing, Zoom acknowledged that "Artificial Intelligence ('AI') has been core to Zoom's product DNA over many years [.]" This strategy culminated on November 25, 2024, when Zoom CEO Eric S. Yuan publicly announced that Zoom had evolved into an "AI-first work company."

40. As described above, on September 5, 2023, Zoom launched "Zoom AI Companion," a term now encompassing a suite of Zoom's related AI-driven technology products. Although it is typically used in a "note taker" capacity,[5] Zoom AI Companion can produce speaker-indexed meeting transcriptions,[6] or serve as an active, chat-based meeting participant via the "ZoomMate" feature,[7] released in June 2026.[8] When Zoom AI Companion is enabled,[9] the meeting host typically receives an email summarizing the main topics of discussion, notes on what certain individuals may have said, and if applicable a list of follow-up action items, key decisions, or main takeaways from the meeting.

41. Framed as a computational task, note-taking is concerned with the problem of summarizing what was said in a meeting and identifying major decisions and outcomes. In order to produce an accurate meeting summary, Zoom AI Companion must start with a precise record of what was said and by whom.

---

[5] https://www.zoom.com/en/products/ai-assistant/features/ai-note-taking/

[6] https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0085682

[7] https://www.zoom.com/en/products/ai-assistant/

[8] ZoomMate, https://archive.is/wip/zIhgy

[9] Enabling or disabling meeting summary with AI. (2026, June 24). Retrieved July 28, 2026, from Zoom website: https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0057960 (Archived: 28 Jul 2026 https://archive.is/kQbI7)

This is accomplished using three basic underlying technologies: *Automatic speech recognition* ("ASR," also referred to as speech-to-text, or "STT"), which produces a transcript of what was said; *speaker diarization*, which identifies which portions of the transcript were produced by different speakers; and *large language models* ("LLMs"), which ingest transcript and speaker information in order to produce a meeting summary. This is the typical technology pipeline for speech-based meeting summary generation, although these same three technologies form the foundation for all of Zoom AI Companion's basic features.

42. Modern spoken language technologies all proceed by first extracting the relevant speech-based acoustic information from an audio stream produced by a microphone. ASR is concerned with the problem of "*what* was said," and begins by computing numeric representations ("features," or "acoustic features") for each sequential span (or "frame") of audio. This process necessarily encodes vocal tract information such as pitch, timbre, and resonance patterns that are biometrically unique and potentially identifiable given a large enough sample from an individual speaker. ASR then maps these acoustic features to an inventory of phonetic speech labels, which are then used to compute the most likely sequence of words that produced the observed acoustic features, i.e. the transcript.

43. Similarly, the process of speaker recognition (which can collectively refer to speaker verification, identification, discrimination, or diarization) is concerned with the problem of "*who* is speaking," but largely relies on the same basic acoustic feature representations as input. In speaker recognition, acoustic features extracted from one or more audio recordings of a given speaker are converted into a stable representation of the identifying characteristics of the speaker's voice which can be compared to future recordings for tasks such as identification or verification. This stable representation, sometimes called a "speaker embedding," is a voiceprint. For tasks such as speaker diarization,[10] speaker

[10] https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0057861

embeddings are computed for segments of speech in a recording containing one or more speakers. These voiceprints are compared to other segments of speech audio and clustered based on similarity to determine which segments of speech in an audio stream correspond to the same speaker, i.e. “who spoke when.”[11]

44. Zoom’s AI Companion offers speech transcription and diarization. Isolating which segments of the ASR transcript belong to individual speakers requires computing speaker embeddings for each segment of the audio stream and clustering them according to similarity to determine which speaker produced it. In computing and comparing the unique vocal characteristics of each speaker in an audio recording, Zoom AI Companion generates a biometric voiceprint for each individual speaker. As in speaker recognition, these speaker representations are stable across recordings and utterances and can be used to compare against future recordings to determine the identity of a given speaker once computed.

### B. Plaintiffs’ Independent Investigation Demonstrates That Zoom’s Speaker Diarization Extracts, Compares, and Applies Biometric Voiceprints.

45. Zoom publicly exposes its capabilities via an application programming interface (“API”) published for external software developers to invoke. This API is called “AI Services”[12] and offers application developers the same features available in Zoom AI Companion, including summarization,[13] transcription,[14] translation,[15] and speaker diarization.[16] As publicly stated in Zoom’s release note for AI Services, the API is “built on the same technology that powers AI features across Zoom and processes millions of media hours daily.”[17]

---

[11] https://www.sciencedirect.com/science/article/abs/pii/S0885230821001121
[12] https://developers.zoom.us/docs/ai-services/
[13] https://developers.zoom.us/docs/ai-services/summarizer/
[14] https://developers.zoom.us/docs/ai-services/scribe/
[15] https://developers.zoom.us/docs/ai-services/translator/
[16] https://developers.zoom.us/docs/ai-services/scribe/#speaker-diarization
[17] https://developers.zoom.us/blog/introducing-zoom-ai-services/ (Archived August 6, 2026: https://archive.is /hzQH8)

46. Using Zoom's AI Services API, any software developer can gain direct insight into the specific capabilities of Zoom AI Companion, enabling empirical analysis of how Zoom's technologies operate and what Zoom's technologies create.

47. Plaintiffs have utilized Zoom's AI Services API to analyze Zoom's speaker diarization technologies and functions. Zoom Scribe is a speech-to-text API. On its website, Zoom states that it is "powered by Zoom's ASR Model Pro" and that it is "built on the same ASR powering millions of Zoom meetings every day." The Zoom Scribe speaker diarization API takes an audio file as input along with a set of parameters such as whether to enable diarization and the expected number of speakers, and produces as output a JSON-formatted metadata file that marks time segments and assigns each speech segment to a speaker identity and label.[18] This diarization is stable and can be used to identify the same speakers within a single audio file or across multiple audio files. Plaintiffs have caused this analysis to be performed using Zoom's AI Services API and verified that this behavior is consistent with Zoom AI Companion. Zoom's speaker diarization could not perform its intended function without the computation of biometrically identifiable voiceprints.

48. Speaker diarization is a spoken language technology that has been the subject of research and development in the peer-reviewed scientific literature for more than two decades. It is defined in the field of speech and speaker recognition as the task of automatically partitioning an audio recording into segments of speech and attributing each segment to the individual who produced it, based on either an estimated number of speakers or by using pre-defined voiceprints, which as stated above, determines who is speaking.[19] [20]

---

[18] *Id.*

[19] Anguera, X., Bozonnet, S., Evans, N., Fredouille, C., Friedland, G., & Vinyals, O. (2012). Speaker diarization: A review of recent research. IEEE Transactions on audio, speech, and language processing, 20(2), 356-370., https://ieeexplore.ieee.org/document/6135543;

[20] Park, T. J., Kanda, N., Dimitriadis, D., Han, K. J., Watanabe, S., & Narayanan, S. (2022). A review of speaker diarization: Recent advances with deep learning. Computer speech & language, 72, 101317., https://arxiv.org/abs/2101.09624.

49. The scientific literature describes a standard processing architecture for speaker diarization that is common to essentially all modern deployed systems.[21] First, a voice activity detection stage locates the portions of the recording that contain human speech. Second, a segmentation stage divides the speech into short sections which are assumed a priori to contain a single speaker. Third, an embedding-extraction stage computes, for each section, a set of acoustic features, such as mel-frequency cepstral coefficients ("MFCCs") or as in modern approaches, a fixed-length numeric vector representation (i.e. a "speaker embedding" such as a speaker factor,[22] i-vector,[23] [24] d-vector,[25] x-vector,[26] [27] or ECAPA-TDNN embedding[28] [29]) that distills the unique voice characteristics of whomever is speaking in that section. Fourth, a clustering stage groups the embeddings using a mathematical similarity score such as cosine similarity,[30] ensuring that sections spoken by the same person fall into the same group. Finally, a labeling

---

[21] Wang, Q., Downey, C., Wan, L., Mansfield, P. A., & Moreno, I. L. (2018, April). Speaker diarization with LSTM. In 2018 IEEE International conference on acoustics, speech and signal processing (ICASSP) (pp. 5239-5243). IEEE. https://arxiv.org/pdf/1710.10468

[22] Castaldo, F., Colibro, D., Dalmasso, E., Laface, P., & Vair, C. (2008, March). Stream-based speaker segmentation using speaker factors and eigenvoices. In 2008 IEEE International Conference on Acoustics, Speech and Signal Processing (pp. 4133-4136). IEEE.

[23] Dehak, N., Kenny, P. J., Dehak, R., Dumouchel, P., & Ouellet, P. (2010). Front-end factor analysis for speaker verification. *IEEE Transactions on Audio, Speech, and Language Processing*, *19*(4), 788-798. https://ieeexplore.ieee.org/document/5545402

[24] Shum, S. H., Dehak, N., Dehak, R., & Glass, J. R. (2013). Unsupervised methods for speaker diarization: An integrated and iterative approach. IEEE Transactions on Audio, Speech, and Language Processing, 21(10), 2015-2028. https://ieeexplore.ieee.org/abstract/document/6518171

[25] Variani, E., Lei, X., McDermott, E., Moreno, I. L., & Gonzalez-Dominguez, J. (2014, May). Deep neural networks for small footprint text-dependent speaker verification. In 2014 IEEE international conference on acoustics, speech and signal processing (ICASSP) (pp. 4052-4056). IEEE. https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/41939.pdf

[26] Snyder, D., Garcia-Romero, D., Sell, G., Povey, D., & Khudanpur, S. (2018, April). X-vectors: Robust DNN embeddings for speaker recognition. In 2018 IEEE international conference on acoustics, speech and signal processing (ICASSP) (pp. 5329-5333). IEEE.

[27] Snyder, D., Garcia-Romero, D., Sell, G., McCree, A., Povey, D., & Khudanpur, S. (2019, May). Speaker recognition for multi-speaker conversations using x-vectors. In *ICASSP 2019-2019 IEEE International conference on acoustics, speech and signal processing (ICASSP)* (pp. 5796-5800). IEEE. https://ieeexplore.ieee.org/abstract/document/ 8683760

[28] Desplanques, B., Thienpondt, J., & Demuynck, K. (2020). Ecapa-tdnn: Emphasized channel attention, propagation and aggregation in TDNN based speaker verification. arXiv preprint arXiv:2005.07143. https://arxiv.org/pdf/ 2005.07143

[29] Dawalatabad, N., Ravanelli, M., Grondin, F., Thienpondt, J., Desplanques, B., & Na, H. (2021). ECAPA-TDNN embeddings for speaker diarization. arXiv preprint arXiv:2104.01466. https://www.isca-archive.org/interspeech_2021/dawalatabad21_interspeech.pdf

[30] Senoussaoui, M., Kenny, P., Stafylakis, T., & Dumouchel, P. (2013). A study of the cosine distance-based mean shift for telephone speech diarization. IEEE/ACM Transactions on Audio, Speech, and Language Processing, 22(1), 217-227.

stage assigns each group a persistent speaker index and attributes every time-stamped section of the transcript to one of those indexes.




**Figure 1.** The standard processing architecture for speaker diarization, common to essentially all modern deployed systems. Speech is first located within the recording, then divided into short sections assumed to contain a single speaker. For each section the system computes a set of acoustic features or a fixed-length numeric vector - a speaker embedding - that distills the unique voice characteristics of whoever is speaking. Those embeddings are then grouped by mathematical similarity, and each group is assigned a persistent speaker index that attributes every time-stamped section of the transcript to one of those indexes.

50. The embedding extraction stage is the key part of the speaker diarization process as it pertains to BIPA, as it depends on the computation of voiceprints. A speaker embedding is a fixed-length numeric vector representation computed from a segment of speech audio that is mathematically engineered such that embeddings extracted from the same speaker's voice will cluster together, while

embeddings taken from different speakers' voices will be farther apart, regardless of what words are spoken. Distance in this sense is usually defined as the length-normalized angle between the vectors, a quantity known as a "cosine similarity."[31] The clustering stage then compares these embeddings to one another using similarity measures to decide whether two stretches of speech came from the same human being.[32]




**Figure 2.** Embedding extraction and comparison, the stage on which speaker diarization depends. Each segment of speech audio is converted into a fixed-length numeric vector that is mathematically engineered so that vectors computed from the same speaker's voice cluster together, while vectors taken from different speakers' voices fall farther apart, regardless of what words are spoken. Distance is measured as the length-normalized angle between two vectors, a quantity known as cosine similarity. The clustering stage compares the vectors by that measure to decide whether two stretches of speech came from the same human being.

[31] Shum, S., Dehak, N., Dehak, R., & Glass, J. (2010). Unsupervised speaker adaptation based on the cosine similarity for text-independent speaker verification. In Proc. Odyssey 20pp. paper-16). https://sls.csail.mit.edu/publications/2010/Shum_Odyssey.pdf

[32] *See, e.g.*, F. Landini et al., Bayesian HMM Clustering of X-Vector Sequences (VBx) in Speaker Diarization, 71 Computer Speech & Language 101254 (2022), https://arxiv.org/abs/2012.14952; N. Dawalatabad et al., ECAPA-TDNN Embeddings for Speaker Diarization, Proc. Interspeech (2021), https://arxiv.org/abs/2104.01466.

51. The speaker embeddings and other numeric representations developed for speaker recognition tasks were not designed specifically for diarization, though as cited in the literature, it is nearly universally one of the first applications to which they are applied. The diarization literature did not develop an independent, non-biometric way of telling speakers apart. It imported the techniques of biometric speaker recognition and reused them as the measure of speech segment identity in speaker diarization.[33] An embedding that permits a machine to group unlabeled stretches of audio by which human beings produced them is by definition capable of distinguishing that individual from others. This requires the computation of a voiceprint, as that term is used in the scientific and patent literature, as well as in BIPA.

52. Speaker embeddings measure physiological and behavioral characteristics of the speaker. The numeric representations computed are the acoustic consequences of the shape and size of the vocal tract, the fundamental frequency of the vocal folds, spectral resonance patterns, and prosodic cadence, and the measurement identifies the speaker regardless of the words spoken. This stability across utterances and recordings is precisely what makes the representation useful, and precisely what makes it biometric.

53. It follows as a matter of established scientific understanding, not opinion, that any system that assigns consistent speaker labels to acoustically disjoint stretches of audio—stretches separated in time, containing different words, with no accompanying metadata—must be computing and comparing speaker-identifying representations of the voice. Content-blind, metadata-blind, temporally consistent attribution of speech to speakers is speaker identification, and speaker identification requires the computation of a voiceprint.

---

[33] T. Kinnunen & H. Li, An Overview of Text-Independent Speaker Recognition: From Features to Supervectors, 52 Speech Communication 12 (2010), https://www.sciencedirect.com/science/article/pii/S0167639309001289. The x-vector, d-vector, and ECAPA-TDNN architectures cited supra were each introduced in the speaker-recognition (voice biometrics) literature and subsequently adopted, unchanged, as the speaker-representation stage of diarization systems. See Park et al., supra note 20.

### C. Zoom's Own Patent Describes Exactly This Voiceprint Machinery, In Exactly These Terms.

54. Zoom's knowledge and intent are documented in its published patents. As alleged above, U.S. Patent No. 12,217,761 B2, "Target Speaker Mode," filed by Zoom in October 2021 and issued to Zoom on February 4, 2025, is written in the technical vocabulary of the speaker-recognition literature, and repeatedly equates that vocabulary with BIPA's statutory term "voiceprint."[34]

55. The patent describes a dedicated software component, "Voiceprint extractor 172," which "provides system functionality for extracting a voiceprint from an audio recording." It states:

> A voiceprint may comprise a digital representation of voice characteristics of a speaker. In some embodiments, a voiceprint may be used to identify whether the speaker in an audio recording is the target speaker or not, based on comparison of the voice characteristics of the audio recording to a voiceprint of the target speaker. In some embodiments, a voice print may comprise an embedding.[35]

56. The meaning of the term "voiceprint" in this text is unambiguous and maps clearly onto Zoom's existing software product offerings. It also fits squarely with the well-understood usage of the term in other patents and in the scientific literature. Diagram 170, to which the aforementioned wording refers, describes a "processing engine" containing all of the necessary components in any modern speaker diarization system. It contains a concept of a "target speaker separation model," (component 178) a "target speaker VAD model" (component 176, referring to "voice activity detection"), "multi-speaker detection," (component 174) a "voiceprint extractor," (component 172) and a "voiceprint repository" (component 180).

57. The patent further explains that "voiceprint 310 may comprise an embedding and may also be called a target speaker embedding," and that such embeddings "may comprise a low-dimensional, learned vector representation." It discloses that the voiceprint extractor "may comprise a machine learning

---

[34] U.S. Patent No. 12,217,761 B2, Target Speaker Mode (filed Oct. 31, 2021; issued Feb. 4, 2025) (assigned to Zoom Video Communications, Inc.) (hereinafter the "'761 Patent").

[35] '761 Patent, col. 5 (Voiceprint extractor 172); id. col. 9–10 (Voiceprint 310).

(ML) model, such as one or more neural networks, CNNs, deep neural networks (DNNs), or other ML models," whose parameters "may be learned through training... based on gradient-based optimization." This is a definitionally similar description of the d-vector/x-vector class of neural speaker embeddings in the scientific literature described above: a learned, low-dimensional vector representation of a speaker's voice, extracted by a trained deep neural network, and used to determine identity by mathematical comparison.

58. The patent also confirms that Zoom's voiceprints are built to persist. It describes a "Voiceprint repository 180," a "repository, dataset, or database of one or more voiceprints," which "may comprise one voiceprint per user or may comprise a plurality of voiceprints per user," and states that a voiceprint "may be stored associated in the user account of the user along with other user data." A stored, per-user database of voiceprints linked to user accounts is enrollment infrastructure, a defining apparatus of a biometric identification system, and it forecloses any suggestion that Zoom's voice processing is a fleeting arithmetic that never amounts to the collection of a biometric identifier.

59. The patent goes further still. It claims "generating a voiceprint of the non-target speaker" and comparing it against the enrolled speaker's voiceprint "to determine a similarity score." That is, Zoom's patented design contemplates computing voiceprints from the voices of people who never enrolled in anything---bystanders, family members, co-workers, and other unconsenting third parties whose voices happen to be captured---expressly so that the system can measure who they are relative to a known speaker.

60. The patent's processing pipeline likewise mirrors the published architecture of diarization systems, stage for stage: an "audio segmenter" divides audio into frames (for example, every 10 milliseconds); a voice activity detection model finds speech; a "multi-speaker detection model"---a trained neural classifier---determines how many people are speaking; and audio frames are "encoded... into an audio signal representation, such as a spectrogram, using, for example, Short-time Fourier Transform

(STFT), filter banks, or other methods"---the standard acoustic front end from which every modern speaker embedding is computed. The patent states that the disclosed methods apply not only to video conferences but to "audio calls, audio recording, video recording, podcasting, and other applications."

61. In short, Zoom's own patent establishes that Zoom possesses, and knows it possesses, production machinery that extracts "voiceprints" from meeting audio, compares them to determine speaker identity, and stores them in per-user repositories.

### D. Plaintiffs' Controlled Demonstration Using Zoom's Own Scribe API Proves Voiceprint Extraction in Zoom's Deployed, Commercial Systems.

62. Zoom exposes its production transcription and diarization tools to the public as a commercial product for software developers. The Zoom Scribe API, part of Zoom's "AI Services" is hosted at Zoom's own API endpoints.[36] Zoom's developer documentation advertises that the Scribe API "[s]eparates speakers when multiple people are present" in submitted audio and returns time-stamped, speaker-indexed transcripts.[37] Any person with a Zoom developer account and valid API credentials can submit audio recordings to this service.

63. To establish precisely what Zoom's systems can do with speech recordings, Plaintiffs have conducted a controlled technical investigation using a meeting in which Zoom AI Companion was enabled and in which meeting participants were not required to authenticate with Zoom in order to join. First, a Zoom meeting was convened by a host using a standard Zoom meeting invitation of the kind circulated for millions of meetings every day. Zoom provides hosts with a join link, a Meeting ID, and a passcode to be shared with meeting invitees. Participants joined as unauthenticated guests and provided no authentication or identifying information when joining other than to supply a written meeting label for

---

[36] Main API endpoint: api.zoom.us

[37] Zoom Developer Documentation, Scribe API – AI Services, https://developers.zoom.us/docs/ai-services/scribe/ (last visited July 27, 2026) (listing among the API's "[k]ey features" that it "[s]eparates speakers when multiple people are present" and "[a]dds timestamps for each segment").

themselves. Joining anonymously is an ordinary, fully supported mode of participation for which Zoom publishes step-by-step instructions. Zoom's support documentation states, "You do not need a Zoom account to join meetings as a participant,"[38] and participants in the investigation followed Zoom's published instructions for joining without an account.[39]

64. The host enabled Zoom's AI features for the meeting through Zoom's standard meeting controls, following Zoom's published instructions for enabling AI Companion.[40] This is accomplished through the meeting settings panel:




Screenshot of Zoom meeting event settings to enable AI Companion

[38] https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0059553 (archived: https://archive.is/ WmNrn)
[39] https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0066743 (archived: https://archive.is/ 0Y5uq)
[40] https://support.zoom.com/hc/en/article?id=zm_kb&sysparm_article=KB0077464 (archived: https://archive.is/ ucIT7)

The host may enable Zoom AI Companion unilaterally, and it will operate on the recorded meeting audio regardless of whether any meeting invitees consent to the use of this feature. Moreover, neither the meeting settings menu nor Zoom's instructions present the host, much less other participants, with any privacy documentation, biometric disclosure, or consent mechanism of any kind.

65. Upon joining, participants only saw a pop-up notice that said, "AI Companion has been turned on."




Zoom AI Companion in-meeting notification

This notice contains no mention of biometric identifiers, biometric information, or voiceprints. There is no mechanism for informed written consent once Zoom AI Companion is enabled, or at any point during the process of joining a Zoom meeting.

66. After the meeting ended, Zoom emailed the host an AI-generated summary that attributed specific statements to specific named individuals, including the unauthenticated guests, identified by the display names they provided upon joining. The summary reported, speaker by speaker, who said what. According to the summary, one named guest "[r]eported that the screen showed 'Zoom AI [Companion] is on,'" and another "[c]onfirmed the same notification appeared on their screen." The summary did not provide the exact transcript of the meeting but provided a selection of specific quotes correctly attributed to the people who uttered them. Attributing utterances in a multi-party audio recording to distinct named individuals is enabled by speaker diarization. This can be demonstrated directly using the Zoom Scribe API. The meeting was recorded by the host in order to extract the audio and run it against Zoom's developer tools.

67. The audio of the meeting, taken from the recording Zoom provided to the host after ending the meeting, was extracted and submitted to the Scribe API with speaker diarization enabled. The

submission consisted of a single monaural audio file, unaccompanied by any Zoom meeting metadata, participant lists, display names, or account information. The API returned a structured transcript comprising numbered speech segments spanning the entire recording, each segment bearing start and end timestamps, word-level timings, and for each segmented chunk of the transcript, a speaker label, e.g. "Speaker 1," "Speaker 2," "Speaker 3," and so on.

68. Standing alone, a transcript indexed by speaker labels could be casually dismissed as assigning speaker numbers arbitrarily or using weakly identifying acoustic features, without those numbers necessarily denoting the same human beings consistently. The investigation therefore included a controlled experiment designed to eliminate this explanation.

69. Plaintiffs' experimental method was both simple and reproducible, focusing on isolating the behavior of Zoom's Scribe speaker diarization API, not on any particular client software or third-party application. Short reference samples of individual speakers' voices, each only a few seconds long, and each recorded separately and independently of the meeting audio, are appended to the front of the meeting recording, separated by stretches of silence, to form a single combined audio file. The reference samples share no words, phrases, or recording conditions with the meeting audio. The samples carry no names, tags, or metadata of any kind; within the submitted file they are indistinguishable from any other audio except by their known position in the audio stream. Because the investigator knows in advance which person's voice occupies which position at the front of the file, the speaker index that the Scribe API assigns to each reference sample can be cross-referenced against the speaker indexes the API assigns throughout the body of the meeting.

70. The result: the Scribe API assigned each reference sample the same speaker index that it assigned to that same person's speech throughout the body of the meeting, notwithstanding that the reference sample and the in-meeting speech contained entirely different words. The reference sample occupying the first seconds of the file was labeled "Speaker 1," and that same speaker's utterances in the

body of the meeting were likewise labeled "Speaker 1"; the second sample was labeled "Speaker 2," matching the same voice's utterances minutes later; and the third sample was labeled "Speaker 3," matching that speaker's speech throughout the remainder of the recording. The correspondence held consistently across repeated trials, across separate and independently submitted API jobs, and across the interleaved, back-and-forth turn-taking of a natural conversation among multiple speakers.

71. A few seconds of a person's voice were sufficient. That is consistent with, and only with, the published performance characteristics of modern neural speaker embeddings, which the scientific literature documents as capable of reliable speaker discrimination from utterances of just a few seconds.

72. The conclusion is inescapable. The Scribe API matched a short, decontextualized, unlabeled sample of a person's voice to that same person's other speech occurring minutes later in a recording, based on nothing but the sound of the voice. In the vocabulary of the scientific literature, that is a speaker-identification trial: the system extracted a speaker-identifying representation from the reference sample (enrollment), extracted comparable representations from the rest of the recording (test), and compared them to determine which utterances came from the same human being (matching). ***Without extracting voiceprints, no process could produce this behavior.***

73. This capability is identification in the fullest practical sense. Any meeting host, employer, or API customer holding a single identified sample of a person's voice---a voicemail, a prior meeting, a social media clip---can attach a name to a speaker index and thereby identify every statement that person makes in any recording processed through Zoom's systems.

74. ***Zoom's AI Companion performs this final linking step automatically: the meeting summary Zoom emailed to the host attributed utterances to participants by name, including unauthenticated guests***. Aligning the Scribe API's speaker-indexed transcript against Zoom's name-attributed summary of the same meeting confirms that they reflect the same underlying speaker-attribution capability, applied to the same voices.

75. The precise mechanics of the requests submitted during Plaintiffs' investigation---each verified by direct, live invocation of Zoom's production endpoints, and each corroborated by Zoom's published developer documentation---demonstrate that Zoom performs voiceprint extraction as an ordinary, credentialed, request-driven service, and that the entire distance between plain speech recognition and biometric speaker attribution is a single configuration parameter.

76. Notably, while Zoom's documentation advertises speaker separation as a headline capability of the Scribe API---it "[s]eparates speakers when multiple people are present"---the published parameter tables for the service do not document the "diarization" parameter itself; its name, type, and effect were confirmed in Plaintiffs' investigation by direct invocation of the production endpoint, which accepts and honors it. The switch that turns Zoom's transcription service into a voiceprint-extraction service is thus live in production but absent from the public parameter reference.

77. Diarization operates only through batch mode. Batch mode requires the audio to reside in third-party cloud storage---in Plaintiffs' investigation, an Amazon Web Services S3 bucket---before the job is submitted.

78. Everything of substance happens on Zoom's side of the exchange: Zoom's servers reach into the customer's cloud bucket, pull the audio into Zoom's AI infrastructure, perform voice activity detection, speech recognition, and voiceprint extraction and comparison on every voice in the recording, and then write the speaker-attributed transcript (the JSON document described below) back into the customer's bucket.

79. The architecture of this invocation is itself significant. The biometric processing is performed entirely by Zoom, on Zoom's infrastructure, under Zoom's credentials, as a metered commercial service. Nowhere in the request schema does Zoom's API ask who is speaking in the audio, whether any speaker has been notified, or whether any speaker has consented to the extraction of a biometric identifier from their voice. There is no consent artifact, attestation, or certification anywhere in

the interface. A single undocumented parameter, available to any developer account, directs Zoom to extract voiceprints from every voice in any recording the customer submits — including the voices of people who have never used Zoom, never saw its terms, and have no way of learning that the extraction occurred.

80. The Scribe API returns its results as a structured, machine-readable JSON (JavaScript Object Notation) document, so there is nothing abstract about what Zoom produces and delivers.

81. Two features of this output bear emphasis. The first is what it contains: a persistent, per-person "speaker" key attached to every utterance in the conversation, joined to exact temporal coordinates at the segment and individual-word level. Zoom thus returns to the submitting customer a complete map of precisely which sections of the audio---by timestamp, down to the word---belong to which measured voice. Those are the specific timestamps and speaker-indexed sections of the transcript that Zoom delivers to whoever requests the job, and that Zoom emails to meeting hosts in name-attributed form.

82. The second is what the output does not contain: no names, no account identifiers, no device or stream information, and no participant metadata of any kind appear anywhere in the document---because none were provided to the API. Every value of the "speaker" field was generated by Zoom's servers from the sound of the participants' voices and nothing else. The "speaker" field is the visible terminus of Zoom's biometric pipeline: the output withholds the underlying voiceprint vectors, but each "Speaker N" value publishes the result of comparing them, and the repetition of identical "speaker" values across widely separated segments is a direct, machine-readable record of Zoom re-identifying the same human being by voice.

**E. The Demonstration Forecloses Every Non-Biometric Explanation.**

83. The labels were not derived from channel or stream metadata. Zoom might suggest that, during a live meeting, it can attribute speech using each participant's separate audio stream (i.e., whose microphone was active) rather than by analyzing voices. The experiment forecloses that explanation: the

audio submitted to the Scribe API was a single mixed monaural file---the API's own output records every segment on a single channel---submitted with no participant metadata whatsoever, and the API attributed speakers correctly anyway. Voice was the only information available. Moreover, stream-based attribution is impossible in the common scenarios of shared devices and conference-room speakerphones, which is precisely why Zoom's patent describes acoustic multi-speaker detection and voiceprint comparison rather than reliance on stream identity. Whether Zoom's in-meeting pipeline additionally consults stream metadata is therefore immaterial: Zoom's deployed, commercial diarization service demonstrably attributes speech to speakers from voice alone.

84. The labels were not positional bookkeeping. The reference samples were separated from their in-meeting matches by intervals ranging from tens of seconds to several minutes, across dozens of intervening speaker turns by other people. An end-pointing system that merely numbered speech segments in sequence, without measuring voices, could not maintain a stable mapping between indexes and human beings across such gaps---still less re-acquire the correct index for a speaker after others have intervened.

85. The labels were not derived from the words spoken. Speaker embeddings are computed from the acoustics of the voice, not from a transcript, and the diarization behavior observed is text-independent: the reference samples need not share any vocabulary with the meeting audio, and the attribution held across utterances with entirely different content. A speech recognizer can determine what was said; it cannot determine who said it. Only a measurement of the distinguishing and identifying characteristics of the voice itself can do that.

86. The labels were not derived from trivial acoustic proxies. Nor can the behavior be explained by some simple, supposedly non-biometric acoustic cue such as average pitch or loudness. Simple low-dimensional cues cannot reliably distinguish multiple speakers---including speakers of similar pitch---across the interleaved turns of natural conversation, and the scientific literature developed high-dimensional learned embeddings precisely because such proxies fail. But the argument would concede the

violation even if it were true: any acoustic measurement of a person's voice that suffices to re-identify that person across separate utterances is a numeric measurement of the unique characteristics of that person's voice used to distinguish them from others---which is to say, a voiceprint.

### F. Zoom Collects the Voiceprint the Moment It Is Computed, and Disseminates the Products of Its Biometric Processing.

87. The voiceprint comes into existence on Zoom's servers at the moment Zoom's models compute it from a participant's voice---before any transcript is returned, and regardless of what Zoom later retains.

88. Zoom also disseminates the products of this biometric processing. While Zoom withholds its internal voiceprint vectors from users, it delivers the outputs those voiceprints generate: speaker-indexed, time-stamped transcripts identifying the precise sections of a conversation attributed to each measured voice, returned through the Scribe API to any developer customer; and name-attributed meeting summaries, delivered by email to meeting hosts. Under 740 ILCS 14/10, "biometric information" encompasses information "based on" a biometric identifier that is used to identify an individual---and a document telling its recipient which human being spoke which words, produced by comparing voiceprints, is exactly that. Zoom thereby hands third parties (hosts, employers, and API customers) the operational benefit of the biometric identification it performed, as to speakers who consented to none of it.

89. Indeed, through the Scribe API, Zoom offers voiceprint extraction and comparison as a paid, general-purpose service: it will perform speaker attribution on any audio any customer uploads---including recordings of individuals who have never used Zoom, never created an account, never seen Zoom's terms, and never had any relationship with Zoom or the customer at all.

### G. Zoom's Voiceprints Are Capable of Identifying the Individuals from Whom They Are Taken.

90. Zoom's patent states that a voiceprint "may be used to identify whether the speaker in an audio recording is the target speaker or not," that the underlying voice characteristics are "features of a

person's voice that distinguish the voice from the voices of other people," and that those features are "dependent on physical features such as the shape and size of a speaker's vocal tract." Thus, Zoom's own engineering documents state that its representation derives from the speaker's physiology and is used to identify.

91. The United States Patent and Trademark Office classified Zoom's patent under Cooperative Patent Classification codes G10L 17/00 (speaker identification or verification techniques), G10L 17/02 (pattern representation and modelling; feature extraction), G10L 17/04 (training, enrolment or model building), G10L 17/06 (decision making and pattern matching), and G10L 17/08 (distortion metrics or distance between a probe pattern and reference templates). These are the classifications for speaker recognition and biometric enrollment.

92. Plaintiffs' demonstration establishes identification capability empirically rather than by inference. The Scribe API matched an independently recorded, unlabeled sample of a known person's voice to that same person's speech elsewhere in a recording, on the basis of voice alone. That is a speaker-identification trial: enrollment, test, and match, performed end to end by Zoom's production systems. A representation that reliably recognizes the same human being across separate recordings is, by definition, capable of identifying that individual.

93. Zoom does not stop at capability; Zoom completes the identification itself. The AI-generated summary that Zoom emailed to the meeting host attributed specific statements to specific named individuals—including the unauthenticated guests, identified by the display names they entered when joining. Zoom thus delivers to its customers a document stating which named human being said which words, produced by comparing voiceprints.

94. Identification under BIPA does not require that the collecting entity separately possess the subject's legal name. Section 15(b) regulates the collection of the identifier, and the collection is complete when the measurement capable of singling out the individual is made.

**H. The Collection Occurs in Illinois.**

95. Plaintiffs and the members of the Class were physically located in Illinois when their voices were captured. The audio from which Zoom generated their voiceprints was produced by microphones on devices located in Illinois and transmitted from Illinois.

96. The Zoom client software that captures and transmits participant audio is installed on, and executes on, the participant's own device. Zoom distributed that software into Illinois, directed it to Illinois residents, and caused it to execute in Illinois.

97. Zoom's collection of Plaintiffs' and the Class's biometric identifiers and biometric information, and Zoom's failure to provide the disclosures and obtain the releases that BIPA requires, therefore occurred primarily and substantially in Illinois.

**I. Zoom Disseminates Voiceprints and Biometric Information Derived from Voiceprints.**

98. Once a voiceprint is computed, Zoom routes, processes, and stores the resulting biometric speaker diarization data on Zoom's own cloud infrastructure and on infrastructure Zoom controls through public cloud providers, including Amazon Web Services (AWS) and Oracle Cloud.

99. Zoom automates the systemic capture, retrieval, and dissemination of this biometric voiceprint data through the integration of Application Programming Interfaces ("APIs"), which function as software-to-software bridges that automate the transmission of data between computer systems.

100. Zoom unlawfully executes this extraction of biometric identifiers and biometric information of persons attending and speaking at Zoom sessions in Illinois without satisfying any of the mandatory notice-and-consent requirements imposed by BIPA.

101. Specifically, in direct contravention of 740 ILCS 14/15(b), Zoom unlawfully collects, captures, receives or otherwise obtains the biometric voiceprint of Illinois residents without first providing written notice of the specific purpose and duration of collection, and without obtaining executed written releases from users.

102. In addition to creating voiceprints of meeting participants, US Patent No. 12,217,761 B2 specifically claims a method of "generating a voiceprint of the non-target speaker," such as co-workers, friends or family members that may be in proximity to a Zoom meeting.

103. Furthermore, Zoom fails to maintain and publish a publicly available data retention and destruction schedule governing these biometric voiceprints, as independently required under 740 ILCS 14/15(a).

**J. Zoom's Delivery of Speaker-Attributed Output to Hosts and API Customers Constitutes Dissemination Under Section 15(d).**

104. Zoom discloses and disseminates biometric information within the meaning of 740 ILCS 14/10 and 14/15(d) each time it returns the products of its voiceprint comparison to a third party. Under Section 10, "biometric information" means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier and used to identify an individual. A speaker-attributed transcript — a document stating which sections of a recording, to the millisecond, belong to which measured voice — is information based on a voiceprint and used to identify the individual who spoke.

105. Zoom disseminates that information in at least two documented ways. First, Zoom returns speaker-indexed, time-stamped transcripts through the Scribe API to any developer customer who submits audio. Second, Zoom transmits name-attributed meeting summaries by email to meeting hosts, attributing specific statements to specific named individuals. Neither disclosure was consented to by the persons whose voices were measured; neither completed a financial transaction authorized by them; neither was required by law; and neither was made pursuant to a valid warrant or subpoena.

**K. ZoomMate's Integration with Third-Party Platforms**

106. In June 2026, Zoom removed the "AI Companion" label and logo from Zoom Workplace, maintaining its core features in "Zoom Workplace," and introduced "ZoomMate" marketed as "your AI teammate" as an advanced, agentic AI add-on. This corporate evolution represents a fundamental shift in

how Zoom's technology intercepts, listens to, and processes private conversations. Whereas the legacy AI Companion functioned primarily as a passive listener and note-taker, ZoomMate actively purports to "turn conversations into action." It operates as an autonomous agentic participant that continuously captures, scans, and analyzes the unique biometric voiceprints of users to identify individual speakers, deduce intent, and execute independent operational decisions. ZoomMate operates "at the center of every conversation where work decisions get made" and is architected to "sit inside conversations" and "understands what was discussed" in order to turn meetings into finished deliverables, all while bypassing BIPA's strict notice-and-consent mandates.[41]

107. To power its advanced agentic features, ZoomMate functions as a live data-routing pipeline that links conversational context and speaker attribution into connected third-party enterprise platforms.

108. Crucially, the information Zoom transmits to these third-party enterprise platforms and AI vendors is not anonymous text. To perform its core function of tracking "who spoke when" and assigning action items to specific human beings, ZoomMate's data links specific conversational actions directly to the unique, programmatically verified biometric identity profiles of individual speakers.

109. Section 15(d) of BIPA strictly prohibits any private entity from disclosing, redisclosing, or otherwise disseminating a person's biometric identifier or biometric information unless the subject consents to the disclosure, or the disclosure is required by law. 740 ILCS 14/15(d).

110. Furthermore, Zoom utilizes a federated AI model structure to sustain ZoomMate's backend processing.[42] In doing so, Zoom systematically transmits user conversational data, speaker-identity profiles, and associated vocal metadata to third-party artificial intelligence vendors, including Anthropic,

---

[41] Zoom News, "Zoom Launches ZoomMate: the first AI teammate built to turn conversations into completed work," June 1, 2026.

[42] Zoom 2026 Annual Report (Form 10-K) at 6 (Feb. 27, 2026).

OpenAI, and NVIDIA, to handle background processing, web-search execution, and automated text creation.

111. Zoom's automated transmission of voiceprint-derived speaker attribution to third-party enterprise ecosystems (such as Salesforce and Jira) and third-party AI frameworks (such as Anthropic and OpenAI) constitutes unauthorized biometric dissemination and redisclosure. Zoom executes these automated transmissions without ever obtaining the consent required for biometric dissemination under Section 15(d).

**L. Zoom Knowingly Captures Users' Voiceprints While Intentionally Evading BIPA's Compliance Mandates.**

112. Zoom's corporate awareness of biometric privacy laws and strict requirements of BIPA is documented in its own public filings with the U.S. Securities and Exchange Commission ("SEC"). In its 2025 and 2026 Form 10-K Annual Reports, Zoom explicitly cited BIPA as an enacted state statute that imposes obligations on businesses collecting or processing "biometric information," stating: "[BIPA] regulates the collection, use, safeguarding, and storage of biometric information and provides for substantial penalties and statutory damages."[43]

1. Zoom's 2025 and 2026 SEC filings go further, admitting to investors that "[o]ur inability or failure to obtain consent for these practices could result in adverse consequences, including class action litigation, mass arbitration demands, and regulatory attention."[44]

2. Zoom's public disclosures reflect corporate awareness that its consent practices with respect to artificial intelligence features expose it to liability under biometric privacy statutes, and that obtaining consent for those practices is in tension with the frictionless, automated operation of its agentic AI platform. Zoom's speaker diarization features are fundamentally incompatible with BIPA's strict,

---

43 Zoom 2025 Form 10-K at 33; Zoom 2026 Form 10-K at 34.

44 *Id.*

individualized notice-and-consent mandate. Despite this internal awareness, Zoom prioritized market deployment over compliance with Illinois law.

3. Despite this recognition, and despite its own patent's description of voiceprint extraction and per-user voiceprint storage, Zoom consciously elected not to implement proper user-facing consent frameworks. When deploying its speaker diarization software and Zoom AI to Plaintiffs and the Class of Illinois residents, Zoom knowingly omitted mandatory notice disclosures that could capture an executed written release from each meeting participant.

4. Instead, Zoom deployed a deliberate, risk-shifting corporate strategy. Armed with full knowledge that its infrastructure actively executes the extraction of biometric voiceprints, Zoom attempts to bypass BIPA by shifting the burden of statutory compliance entirely onto third-party meeting hosts and account managers through passive contractual terms.

5. Zoom's calculated choice to deploy an intentionally non-compliant software and AI architecture — while actively tracking biometric risk factors in its SEC filings—goes beyond mere negligence. It constitutes a deliberate, reckless, and intentional disregard of the statutory rights of Illinois consumers under BIPA.

**M. The Irreversible Privacy Harms Suffered by Plaintiffs and Class Members.**

6. Unlike passwords, credit card numbers, or social security numbers, which can be modified or reissued if compromised, biometric identifiers are unique and immutable. Once a person's voiceprint is extracted, analyzed, and disseminated to external platforms by Zoom, that individual permanently loses the ability to control the very biometric information that defines their identity.

7. Because voiceprints cannot be changed, they are uniquely vulnerable to commercial exploitation, biometric identity theft, unauthorized deepfake voice replication, and security breaches.

8. Zoom's unlawful collection, use, and dissemination of Plaintiffs' and Class Members' unique voiceprints have inflicted an ongoing, irreversible injury to their privacy interests in direct violation of BIPA.

9. Plaintiffs and the proposed Class had no way of knowing about Zoom's conduct detailed herein. Zoom did not disclose that it collects biometric identifiers, and the only in-meeting notice observed announced merely that "AI Companion has been turned on." For these reasons, any statute of limitations or statute of repose that otherwise may apply to the claims of Plaintiffs and members of the Class should be tolled.

## CLASS ACTION ALLEGATIONS

10. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons who, while physically present in Illinois, attended and spoke at a Zoom audio or video session from September 5, 2023 to the present at which Zoom AI Companion or ZoomMate technologies were enabled and whose biometric voiceprints or biometric information derived from their voiceprints were collected, captured, received, retained, or disseminated by Zoom.

11. Excluded from the Class are Zoom; its officers, directors, legal representatives, successors, subsidiaries, employees, and assigns; any entity in which Zoom has a controlling interest; the judge presiding over this action and members of the judge's immediate family and staff; and Plaintiffs' counsel and their immediate families.

12. This action is properly maintained as a class action under Federal Rule of Civil Procedure 23 because the Class is so numerous that joinder of all members is impracticable; there are questions of law and fact common to the Class; Plaintiffs' claims are typical of the claims of the Class; Plaintiffs will fairly and adequately protect the interests of the Class; common questions predominate over questions affecting only individual members; and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

13. **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the Class are so numerous that individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, it is heavily documented that Zoom serves millions of users daily. The Class likely comprises tens of thousands, if not hundreds of thousands (or more), of persons who have attended and spoken at a Zoom session in Illinois at which Zoom AI Companion and/or ZoomMate technologies were enabled. The identities of Class members are ascertainable from Zoom's records, including its account records and the service-generated telemetry and product usage data that Zoom states it collects and owns.

14. **Commonality** (Fed. R. Civ. P. 23(a)(2)). There are questions of law and fact common to the Class, including:

a) Whether the numeric speaker representations Zoom's AI Companion and Zoom WorkMate compute from participant audio are "voiceprints" and therefore "biometric identifiers" under 740 ILCS 14/10;

b) Whether those representations are capable of identifying the individuals from whom they are taken;

c) Whether Zoom collected, captured, or otherwise obtained, stored, used, or disseminated Plaintiffs' and the Class's biometric identifiers or biometric information;

d) Whether Zoom informed Plaintiffs and each Class member in writing that a biometric identifier or biometric information was being collected or stored;

e) Whether Zoom informed Plaintiffs and each Class member in writing of the specific purpose and length of term of collection, storage, and use;

f) Whether Zoom obtained a written release as defined in 740 ILCS 14/10;

g) Whether Zoom disclosed or disseminated biometric identifiers or biometric information to third parties without consent in violation of 740 ILCS 14/15(d);

h) Whether Zoom developed, made available to the public, and complied with a written policy establishing a retention schedule and destruction guidelines under 740 ILCS 14/15(a);

i) Whether Zoom's violations of BIPA requirements were committed intentionally, recklessly, or negligently.

15. **Typicality.** Plaintiffs' claims are typical of the claims of the Class in that Zoom collected, captured, or otherwise obtained, stored, used and/or disseminated Plaintiffs' and the Class's biometric identifiers or biometric information when they attended and spoke at a Zoom session in Illinois at which Zoom's AI Companion and/or Zoom WorkMate were enabled, without the mandatory notice-and-consent requirements imposed by BIPA.

16. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)). Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class members Plaintiffs seek to represent, and Zoom has no defenses unique to Plaintiffs. Plaintiffs have retained counsel competent and experienced in complex litigation, class actions, and biometric privacy litigation, who possess the resources necessary to prosecute this action vigorously to its conclusion.

17. **Predominance** (Fed. R. Civ. P. 23(b)(3)). Common questions predominate over any questions affecting only individual members. Zoom's software operates uniformly across all users; whether its output constitutes a voiceprint is a single technical question common to every Class member; and whether Zoom provided the statutory disclosures and obtained written releases admits of a uniform answer, because Zoom provided none to anyone. Statutory damages are fixed by statute and require no individualized proof.

18. **Superiority** (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. Individual claims are of modest value relative to the cost of litigating them, and most Class members are unaware that their biometric identifiers were collected at all. Class treatment provides the benefits of unitary adjudication, economies of scale, and comprehensive judicial oversight, and presents fewer management difficulties than individual litigation.

19. Rule 23(b)(2). Zoom has acted on grounds generally applicable to all members of the proposed Class, so that final injunctive and corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiffs seek certification under Rule 23(b)(2) with respect to the injunctive and declaratory relief requested, and under Rule 23(b)(3) with respect to statutory damages.

20. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)**
**Failure to Obtain Informed Written Consent and Release before Obtaining Biometric Identifiers or Biometric Information**
***(On Behalf of Plaintiffs and the Class)***

21. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

22. Under BIPA, a private entity is not allowed to collect, capture, purchase, receive, or otherwise obtain a person's biometric identifier or biometric information unless it first satisfies the mandatory notice-and-consent requirements. 740 ILCS 14/15(b).

23. Zoom is a "private entity" as defined by 740 ILCS 14/10.

24. Voiceprints constitute "biometric identifiers" under 740 ILCS 14/10.

25. Plaintiffs and members of the Class are individuals who attended and spoke at Zoom sessions on and after September 5, 2023 where Zoom's AI Companion and/or ZoomMate technologies have been enabled and have had their biometric voiceprints and biometric information derived from their voiceprints collected and captured by Zoom.

26. At such sessions, Zoom systematically has collected, captured, received, or otherwise obtained these biometric voiceprints and biometric information derived from the voiceprints from Plaintiffs and members of the Class every time they participated in a Zoom session where Zoom's AI

Companion and/or ZoomMate has been enabled, and Zoom will continue to do so at future Zoom sessions unless enjoined from doing so, as Plaintiffs request herein.

27. Zoom did not provide Plaintiffs and members of the Class with the mandatory written disclosures required by 740 ILCS 14/15(b)(1)-(2) prior to collecting, capturing, receiving, or otherwise obtaining their biometric voiceprints and biometric information derived from the voiceprints.

28. Zoom did not secure executed written releases from Plaintiffs and members of the Class as mandated by 740 ILCS 14/15(b)(3), prior to collecting, capturing, receiving, or otherwise obtaining Plaintiffs' and the Class's voiceprints and biometric information derived from the voiceprints.

29. Zoom's knowing deployment of a technological architecture that was non-compliant with BIPA's statutory requirements constitutes an intentional, reckless, or negligent violation of 740 ILCS 14/15(b).

30. As a result of the foregoing, Plaintiffs and members of the Class have suffered a violation of their right to privacy and are entitled to statutory damages under 740 ILCS 14/20(a)(1) and/or (2); a permanent injunction requiring Zoom to comply with BIPA's notice and informed consent requirements pursuant to 740 ILCS 14/20(a)(4); and reasonable attorneys' fees, costs, and other litigation expenses pursuant to 740 ILCS 14/20(a)(3).

## Second Claim for Relief

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)
### Failure to Develop, Maintain, and Make Available to the Public a Written Policy Establishing a Retention and Destruction Schedule
***(On Behalf of Plaintiffs and the Class)***

31. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

32. BIPA mandates that any private entity in possession of biometric identifiers or biometric information must develop, maintain, and make available to the public, a written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been

satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a).

33. Zoom is a "private entity" as defined by 740 ILCS 14/10.

34. Voiceprints constitute "biometric identifiers" under 740 ILCS 14/10.

35. Plaintiffs and members of the Class are individuals who attended and spoke at Zoom sessions on and after September 5, 2023 where Zoom's AI Companion and/or ZoomMate technologies have been enabled and have had their biometric voiceprints and biometric information derived from their voiceprints collected and captured by Zoom and whose voiceprints remain in Zoom's possession.

36. Zoom failed to develop, maintain, and make available to the public a written policy establishing a retention and destruction schedule of Plaintiffs' and the Class's biometric voiceprints and biometric information extracted through its speaker diarization and ZoomMate AI frameworks.

37. Zoom retains the voiceprints of Plaintiffs and the members of the Class notwithstanding that the initial purpose for their collection -- the conduct of the sessions in which they were generated -- has been satisfied, and has failed to destroy them, in violation of 740 ILCS 14/15(a). Zoom's patent confirms that Zoom built the infrastructure to retain what it extracts, describing a "voiceprint repository" storing voiceprints "associated in the user account of the user."

38. Plaintiffs and the members of the Class have thereby suffered a concrete and particularized injury in addition to and distinct from the absence of a published policy: Zoom's continued unlawful possession of their immutable biometric identifiers beyond the period Illinois law permits, and the deprivation of the information necessary to know whether, when, or how those identifiers will be destroyed.

39. Zoom's failure to develop, maintain, and make available to the public a written policy establishing a retention and destruction schedule constitutes an intentional, reckless, or negligent disregard of its statutory obligations.

40. As a result of the foregoing, Plaintiffs and members of the Class have suffered a violation of their right to privacy and are entitled to statutory damages under 740 ILCS 14/20(a)(1) and/or (2); a permanent injunction requiring Zoom to develop, maintain, publish, and comply with a retention and destruction policy and to destroy voiceprints unlawfully retained pursuant to 740 ILCS 14/20(a)(4); and reasonable attorneys' fees, costs, and other litigation expenses pursuant to 740 ILCS 14/20(a)(3).

## <u>Third Claim for Relief</u>

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)
### Unauthorized Dissemination and Redisclosure of
### Biometric Identifiers or Biometric Information
***(On Behalf of Plaintiffs and the Class)***

41. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

42. BIPA strictly prohibits a private entity from disclosing, redisclosing, or otherwise disseminating a person's biometric identifier or biometric information unless the subject provides specific, explicit consent to the disclosure, or the disclosure is required by law. 740 ILCS 14/15(d).

43. Zoom is a "private entity" as defined by 740 ILCS 14/10.

44. Voiceprints constitute "biometric identifiers" under 740 ILCS 14/10.

45. Zoom has disclosed or disseminated to third parties Plaintiffs' and the Class's biometric voiceprints and biometric information derived from those voiceprints.

46. Zoom disseminates biometric information by returning speaker-indexed, time-stamped transcripts through the Scribe API to developer customers, and by transmitting name-attributed meeting summaries to meeting hosts. Zoom further disseminates speaker attribution through ZoomMate's integrations with third-party enterprise platforms and artificial intelligence vendors.

47. Plaintiffs and members of the Class did not consent to these disclosures. No disclosure completed a financial transaction authorized by them, none was required by federal, state, or municipal law or ordinance, and none was made pursuant to a valid warrant or subpoena. 740 ILCS 14/15(d)(1)-(4).

48. Zoom's knowing deployment of a technological architecture that is non-compliant with BIPA's statutory requirements and disseminates Plaintiffs' and the Class's biometric voiceprints and biometric information derived from those voiceprints constitutes an intentional, reckless, or negligent violation of 740 ILCS 14/15(d).

49. As a result of the foregoing, Plaintiffs and members of the Class have suffered a violation of their right to privacy and are entitled to statutory damages under 740 ILCS 14/20(a)(1) and/or (2); a permanent injunction requiring Zoom to cease disseminating biometric identifiers and biometric information in violation of BIPA pursuant to 740 ILCS 14/20(a)(4); and reasonable attorneys' fees, costs, and other litigation expenses pursuant to 740 ILCS 14/20(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, request that the Court enter judgment against Defendant Zoom Communications, Inc., as follows:

A. Certifying the Class under Federal Rule of Civil Procedure 23(b)(3) with respect to statutory damages, and under Rule 23(b)(2) with respect to injunctive and declaratory relief; appointing Plaintiffs as Class Representatives; and appointing Plaintiffs' counsel as Class Counsel under Rule 23(g);

B. Declaring that Zoom's acts and omissions violate 740 ILCS 14/15(a), 14/15(b), and 14/15(d);

C. Awarding statutory damages of $5,000 for each intentional or reckless violation, or $1,000 for each negligent violation, pursuant to 740 ILCS 14/20(a)(1)-(2);

D. Awarding injunctive relief for the benefit of the Class and for the general public of the State of Illinois pursuant to 740 ILCS 14/20(a)(4), including an order requiring Zoom to (i) provide the written disclosures required by 740 ILCS 14/15(b)(1)-(2) and obtain written releases as required by 14/15(b)(3) before collecting any biometric identifier from any

person attending a Zoom session in Illinois; (ii) develop, maintain, publish, and comply with a written retention and destruction policy as required by 740 ILCS 14/15(a); (iii) cease disclosing or disseminating biometric identifiers and biometric information of any person attending a Zoom session in Illinois in violation of 740 ILCS 14/15(d); and (iv) permanently destroy all voiceprints obtained from any person attending a Zoom session in Illinois in violation of BIPA;

E. Awarding reasonable attorneys' fees, costs, and litigation expenses pursuant to 740 ILCS 14/20(a)(3); and

F. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

Dated: September 25, 2026

Respectfully submitted,

*/s/ Patrick Carey*

Patrick Carey, (Bar No. 308623)
**LEXINGTON LAW GROUP, LLP**
503 Divisadero Street
San Francisco, CA 94117
Telephone: 415-913-7800
pcarey@lexlawgroup.com

David S. Golub *(pro hac vice forthcoming)*
Ian W. Sloss *(pro hac vice forthcoming)*
Jennifer Sclar *(pro hac vice forthcoming)*
Jennifer A. Williams *(pro hac vice forthcoming)*
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, 15th Floor
Stamford, CT 06901
(203) 325-4491
dgolub@sgtlaw.com
isloss@sgtlaw.com
jsclar@sgtlaw.com
jwilliams@sgtlaw.com